at all. Oral argument not to exceed 15 minutes per side. Mr. Bostick for the appellant. Good morning, your honors. Nick Bostick on behalf of all plaintiffs and I have asked to reserve three minutes for rebuttal. Thank you for giving me the opportunity for oral as looking back at my brief, because the district court found a constitutional violation, I sort of revamped my research to focus on the clearly established right portion and how we determine the contours and how we determine the level of specificity that's required. In doing that, I noticed that I relied heavily on Jardines. They relied heavily on Carroll v. Carmen, both of which were decided after the conduct at issue. But going backwards through Jardines, you find that that court relied on United States v. Jones, which was a 2012 case, and it relied heavily on it for the concepts about the classification of using the dog on the porch and whether it's a search. I'm losing the end of your sentences. Can you repeat that? The concepts of when a court decides a search occurred, in part, looks at what the officer was intending to do. And I don't mean in a subjective manner, I mean based on the objective facts available. So going backwards from Jones, which was a 2012 case, they relied on Silverman v. United States, which is interesting because that brings us into the concept of capturing communications, electronic eavesdropping, and things of that nature. And that's really where I would like this court to focus as you decide whether the conduct of the officers in going along the sides of the house to listen and look in the windows falls within the contours of what we have established all the way back to Silverman in 1961. The Hardesty case I don't think changes the analysis or helps either side because even though it's from 06, as the officers approached there was a change in the condition of the home. Someone turned the lights out. There were issues of whether someone inside needed assistance. So the purposes ostensibly were different objectively but in a light most favorable to the plaintiffs, those two officers went along the sides of the house to gather information. And I think that's where the district court made its mistake and I believe that was reversible error. Now he did rely on Turk v. Comerford which was unpublished. Again, that's from 2012. Our conduct was August 14, 2011. But Comerford went all the way back to Stiegald 451 U.S. 204 and that's the case where it was first determined that even with an arrest warrant the police cannot search a third party's Nonetheless, the concept covers that, covers our situation. The police to a third party's home looking for someone else. And I know the court's familiar with the facts. They were quite well developed and briefed. The police, it doesn't appear to me they really claim that they believe Robert lived there. They knew he stayed over at the other place. His phone was there, his vehicle was there, his bedroom was there, his baseball bat was there. So I think again in a light most favorable to the plaintiffs, this was not considered his dwelling. Unfortunately in Comerford we don't know a lot about the extensiveness of the entry into the curtilage. It just doesn't give us much specifics. The only thing we that case was at 9 o'clock in the morning. And here it was August so it was daylight well into the evening if it was sunny. But obviously the breach of the door occurred I think a little bit after midnight on the following day. When they breached, they had a warrant though, is that right? Oh yes, yes. I think they had both You're talking about the pre-warrant activity at this time? Yes. I think they actually had a search warrant and an arrest warrant. I think. So if we just go back and look at Sixth Circuit precedent for dealing with backyards, I realize at this point I'm talking about the side yard where they're gathering information, but nonetheless they broke the plane of the front of the dwelling. And that brings us to Dauenbaugh versus Tiffin which is in my brief, and United States versus Jenkins. So we have a 98 and a 97 case fairly clearly establishing the protection for the backyards. So that's where I think the district court again went astray on working within how to define the contours. And of course we have significant discussions. Most recently is Hope versus Pelzer, 536 U.S. 730. And it talked about immunity and the degree of specificity and the fact that a novel fact situation can be included and therefore deny immunity. And I think that's what happened here. But in that regard you're just talking about, I assume, entering on the property, trying the initial knock and talk, and saying that once nobody answered, remaining on the curtilage and going beyond looking, listening, that was the constitutional violation. Yes. Schmidt and Clayton are the ones that went down the sides of the house. And then going or the remaining? For Schmidt and Clayton it was going. So your position is that it's clearly established that an officer trying to investigate something has no right to enter the curtilage without a warrant? There are exceptions. There are. The usual hot pursuit. He sees something. And the case law is pretty clear. If he makes an objective observation from a place where he's lawfully at, then he can react to that and go enter to prevent the destruction of evidence, render aid, things of that nature. So I wish I could say it's unqualified, but it isn't. But in this context, without more, they could not go in there. And I think the key is their was to see if they heard any activity or could determine if Robert was there. They were looking for evidence to justify... Well, they initially wanted to do a knock and talk, right? Yes. And it was okay to go on to knock, right? Stying away on the porch for a period of time was lawful. I personally have a problem with him looking in the window, but I don't think I have the legal authority to say that that was a constitutional violation. Maybe a little bit socially inappropriate, but we're not to the constitutional level. But stying away on the porch for five minutes, ten minutes, fifteen minutes, I'm not going to win claiming that that's a violation of the Constitution. But we're talking hours at this point. That's the difference, right? Yes. Not that they were necessarily looking for evidence. It's that they, at least as I understood what the district court did in this case, it's an extended knock and talk. An hours long knock and talk, in other words, trying to rouse these people so that they could speak with them. And that, the district court said, was problematic, but it wasn't clearly established that it was problematic. If I'm understanding that correctly, that doesn't have anything to do with searching for evidence. That has to do with trying to rouse the people in the house so that you could talk with them, which is not crazy as a matter of social mores. I mean, if you go to a house and you know they're in there and you ring the doorbell and you yell and nobody comes and you really want to talk to them, you go around the back and knock on the back door. Or you see if the lights are on to see if they're really there. You could say, well that should be constitutionally prohibited, but then you have to have a case which says that's constitutionally prohibited, not an analogy to a case where they're in the backyard looking for marijuana or something like that. That's the way I'm thinking the case is presented. How do you respond to that? But third parties, salesmen, solicitors, they would not go to the back. I'm not talking about salesmen or solicitors. Acquaintances. People who really, yeah, acquaintances. Maybe, but the police. I've got people go to the back of my house all the time when no one answers in the front. Well, the case where the, it was Carroll versus Carmen is the case where the house was on the back porch and you're automatically looking into the side yard and the back porch and it's just a few feet away from the street. And that creates a significant problem. And where I think we're on solid ground here is the rural setting. Doesn't Hardesty say that if you have indications that there's somebody inside, if the police have indications that there's someone inside, they can go around to other entrances to see if they can rouse them? I know the one fact that I made particular note of from Hardesty was the fact that as the police were approaching, the lights went out. Well, here, correct me if I'm wrong on the facts, but the police had good reason to believe that your client had gone to this house and when they got there, his truck was there and the hood was warm. Yes. So that gives them good reason to believe that he's inside. I don't think we have a good time frame about how long it took the police to get over there. The officer from the scene stayed and talked to people for a while and then he went over there and they met, I think, out at the street. So it was a fairly reasonable time. But my point is, he could have left. They don't have, Hardesty doesn't say they have to have proof. They just have to have good indications that there's somebody inside. And you may answer and then if you want to reserve your time, you're right. And the lights going off in the house at Hardesty was a definitive thing. And they didn't have anything additional other than the truck parked in the driveway until they went along the sides of the house. Good morning, Your Honors. Lindsey Peck on behalf of the defendants and appellees. I guess I'll start with the search claim since that's what you mainly focus on. Keep your voice up. Yes. I'll start with the unlawful search claim since that's what Mr. Bostic focused on. I think it's within the scope of the knock-and-talk investigative technique. As this court held in Hardesty, the officers can go around to other entrances to see if someone is available. And as Your Honors noted, they had good reason to believe that Robert's inside the house. His truck was there. It was warm. This was about a half an hour, took them about a half an hour for the deputies to get there after they interviewed the complainant. So they  had good reason to believe that Robert's inside the house. Five hours is a long time to knock. I understand you can say you can creep up from half an hour to an hour to an hour and a half. But at some point, a difference in time becomes metaphorically different. I mean, they couldn't do it for days, could they? No, Your Honor, and I understand that. The time issue is the big issue here. But there's testimony they got there around 7 o'clock and left at about 840 to get a warrant. Now they were trying to get a hold of someone inside the house and around the house, and two of them did enter the curtilage. But as you know, this court's decisions in Hardesty and the Supreme Court's decisions in Carroll said that's permissible. And as to the time factor, I know the district court cited Jardines, which said basically, described this implied license as allowing officers to go to the door, knock promptly, wait briefly to be received, and then absent an invitation to linger longer, leave. That's the implied license that we're talking about in this case, right? Correct. You're saying it's broader than that. No, what I'm saying is that Jardines was issued in March 2013. This case occurred in August 2011, and at that time, there's no case that even really touched on the durational limits of a knock-and-talk. He mentioned, well, Turk v. Comerford, where this court essentially held that there was no clearly established law addressing whether it was constitutional to surround the house by the curtilage during a knock-and-talk. That was issued after this incident, but they were looking at whether it was clearly established in February 2009, because that's when that incident occurred. So I think that case is relevant here as well. In terms of this concept that what the deputies were doing was amounting to a search, your Honor mentioned these cases are distinguishable, and they are. The Jardines case, I mean, they're doing this knock-and-talk with a drug-sniffing dog, alerting to marijuana. That's quite different than what the deputies did here. It was just trying to get ahold of someone in the house. There was really no evidence, incriminating evidence, even to search for on this property. Same with the Daunbaugh case. There they were looking for stolen property that was being secreted in the garage. Here, they're just trying to make contact with someone inside the house. How long did it take to get the warrant? It took about three hours. To actually get it? Yes. He left at 840, and there was testimony. He didn't get back until about, he got it about 1130, got back about midnight. What do you call that time while they're waiting and they're still on the property? I think that's what's not clearly established, is whether they were entitled to do that without a warrant. I know this knock-and-talk was kind of an extended knock-and-talk, but I don't think there's any case, and I know the district court was unable to find any. Plaintiffs didn't point to any case that said that what these deputies did, just staying on the property to make sure he didn't leave, was clearly wrong. Is this on the property or in the curtilage? How long were they in the curtilage? They were in the curtilage for the first hour and a half, knocking, trying to get a hold of someone, and then when Deputy Steinaway left, they said they were about 50 to 60 yards from the house. So they were only in the curtilage for an hour and a half? Correct. And at that point, they were, I guess, outside the curtilage, but making sure that he wasn't going to leave. You have the right to be outside of the curtilage, though, right, or not? Yes. So where did they wait? They all waited in one spot? No, they were still on the property. They were just about 50 to 60 yards away from the house. And I guess it's not really developed whether that's still within the curtilage. I would argue that it's not, but... Sixty yards from the house is arguably in the curtilage? Well, I mean, I don't know. They live on 20 acres, so it's, you know, they have this large property, and I guess that was the concern, you know, with they didn't want all of them to leave. I mean, there's multiple exits. This is 20 acres. They have to... I mean, this is a pretty serious and violent crime that he's... The most difficult part is being on the curtilage, or in the curtilage, like under the eaves or just under the window or whatever, for hours, as opposed to minutes, because the implied... Implied license, yes. Implied license. The implied license is that you can go to the door and knock. You can be an acquaintance or a friend returning from years ago or somebody trying to hand out bills or whatever. People implicitly allow that, most people. And so it's constitutionally okay to do that. The difficulty is extending that for a long time, and it's interesting that it's really only an hour and a half, though, which is still a long time for that kind of thing, but it's not five hours. The five hours is being yards away. Right. But I think it's really... It really is a gray area, you know, when you look at the case log, because there's a lot of cases where, you know, an officer goes to get a warrant and you have other officers surrounding the house, securing the perimeter, making sure, you know, the deputy doesn't leave. And there's never been a case to say that, you know, even if they're on the curtilage, what they're doing is wrong. I mean, this is a pretty common police action, and I think there needs to be some case, as you mentioned, to put these deputies on notice, that if they can't do that, there needs to be some case to put them on notice of that. I think this fell within, at most, a gray area. And I would like to... What about the flash ban? The flash ban. Well, I would first argue, I guess, that the use of a flash ban didn't violate clearly established law. This incident, like I said, occurred in August 2011. At that time, the only case finding a constitutional violation for a flash ban was, I think, Your Honor authored, Bang versus City of Whitehall. That case was very distinguishable in that the officers supposedly knew, going into it, that there were highly flammable accelerants in the house, and that the flash ban would likely cause a fire. And it, in fact, did cause a fire, if I recall correctly. And I think, as Your Honor noted, in Ramage v. Louisville Jefferson County Metro Government, that was a March 2013 opinion, that the court had never held that the use of a flash ban constituted excessive force. I know Marble Sheen was another case that found it wasn't clearly established. I also think that the use of a flash ban was objectively reasonable here. You know, if we start out with the crime at issue, it was a pretty serious crime. Petra had reported that he used a baseball bat, threatened her with it, threatened to bash her brains in, stole her phone when she tried to call for help. There was also the issue that after Lieutenant Domney got to the scene, he had an intelligence officer come in and gather information, and that officer found that Robert stored guns at his parents' house. You know, they had reason to believe that Robert knew the deputies were outside, so they had really no idea what was awaiting them inside. Why not say, we have a warrant, it's time for you to come out? Yes, I know there was an issue with, before the tactical team went in, there was a crisis resolution team that did the negotiations, and there's an issue there with, you know, why didn't they tell them they had a warrant? And I believe there is testimony that they did not mention the warrant during negotiations. But there's also testimony that the TAC team, before they went in, did mention the warrant. Who mentioned it? There was, there was like a period where there was the crisis, the hostage negotiators, trying to, you know, using the bullhorns, the flashing lights, making announcements, phone calls. And there's an issue there, well, did they even tell them they had a warrant? No, they didn't. But none of those negotiators, nor their supervisors, are parties to this case. So I'm looking at, you know, what Lieutenant Dominate did, and he supervised the tactical team, which did announce there was a warrant before they entered the house. How long before they entered, did they do that? I think it was at the time of entry. You know, it was, you know, search warrant. The district relied, I thought, on something that you barely mentioned when you made your list of all these factors, and that was the long wait. Right. So the idea that I took from that reliance was, this wasn't just going into a house and surprising people. These people presumably were in there for hours, being non-responsive, and when that happens, you might be able to draw an inference that they're hostile or that they're preparing traps or whatever, and so therefore, you might want to be a little bit, or a lot more aggressive, shall we say, when you enter. Right. And you don't rely on that? Yeah, well, I mentioned that, you know, they had, Lieutenant Dominate had reason to believe that Robert knew that the deputies had been outside, because they'd been knocking and also the access to guns, so they had no idea what they were going into when they entered the house. And again, I would go back to the fact that I don't believe that the use of a flashbang was a clearly established violation at the time that this occurred. There is also a failure to intervene claim. I don't know if you want me to get into that. Essentially, the father of the suspect says, you know, he was assaulted when the TAC team went in, and he's claiming Lieutenant Dominate failed to intervene. I just, there's no evidence that he witnessed this assault or had the opportunity to intervene. I think it's pretty well brief, so I'll just leave it at that. Thank you. Thank you, Counsel. Thank you. Thank you, Your Honor. I know during the depositions, the officers would not acknowledge an overhead satellite shot that I had to refresh their memory as to the layout, but then they put it in one of their briefs in the district court. The defendants put an aerial photo of the property, and I'm sorry I can't give you the page ID number, but it is. It's in one of the districts. I don't know if it's in an appellate brief, but it's in the district court record. The 50 to 60 yards, you know, it's a large backyard. Is there any law out there that says how you measure the size of the curtilage? No, we have the factors, you know, the proximity, the use, enclosures, you know, are there play and Carol was the corner lot. This concept is only going to be able to be identified in a limited nature forever. We have so many configurations of residential properties that the courts are going to have to hold the police to some common sense about applying these factors. It's real tough to put that in the context of something that's clearly established out that 50 to 60 yards out was still within the curtilage in this property. Right, and that's why I wanted to bring it up was because it was either Clayton or Schmidt, we were sort of joking at the deposition about the mosquitoes because it was August and he was just getting eaten alive by mosquitoes. And when somebody left to go get the warrant, I do remember there was testimony about the number of officers, I think they had three, and then when one left to get the warrant, somehow they changed a little bit. But they were still in a position to clearly see the house, which was the point of them being there. So in my last remaining seconds, I just want to talk about the flashbang, the use of the SWAT team. And for Lieutenant Dominey, he trained these guys. He trained them, he selected them, he put them on this team, he set their policies. And the way they treated Mr. Nylas, I put that quote of him in the last very end of my brief. Nobody says it better about the animalistic behavior that they demonstrated toward him. Not telling these people there was no warrant is eminently unreasonable. So I would ask that you reverse the district court. Thank you. Thank you, counsel. Case will be submitted. We call the next case.